THE STATE OF OHIO, APPELLEE, *v.* SHEPPARD, APPELLANT.*

---

*Motion for leave to appeal overruled, January 11, 1956. Appeal dismissed, 164 Ohio St., 428. For opinion on merits and for counsel see: *State* v. *Sheppard, ante,* 345.

(No. 23551—Decided July 20, 1955.)

Kovachy, P. J. Samuel H. Sheppard was convicted of murder in the second degree by a jury in the Common Pleas Court of Cuyahoga County and sentenced to life imprisonment in the Ohio State Penitentiary. He appealed that conviction and judgment to this court in *State* v. *Sheppard, ante,* 345, which judgment was affirmed.

This is a separate appeal emanating from that cause on the sole ground that there is error in the record and proceedings in the Court of Common Pleas of Cuyahoga County prejudicial to the rights of the defendant in overruling his motion for a new trial on the ground of newly discovered evidence.

The motion reads:

"Now comes the defendant, and moves for a new trial on the ground of newly discovered evidence material to the defendant, which he could not with reasonable diligence have discovered and produced at the trial, and the defendant further requests that an oral hearing be had on this motion."

The defendant produced at the hearing on this motion, in support thereof, the affidavits of the witnesses by whom such evidence was expected to be given, and the prosecuting attorney produced affidavits to impeach the affidavits of such witnesses, all in accordance with subparagraph F of Section 2945.79 of the Revised Code.

There were filed by the defendant:

Affidavit N. D. E. 1, made by Samuel H. Sheppard. It deposes that he is right handed.

Affidavit N. D. E. 2, made by Arthur E. Petersilge, one of counsel for defendant. It sets forth that on several occasions during the trial he sought delivery to the defendant of the keys to the home of the defendant and his murdered wife, and that such request was refused by the office of the county prosecuting

attorney until December 23, 1954—two days following the rendition of the verdict by the jury.

Affidavit N. D. E. 3, made by Stephen A. Sheppard, brother of defendant. It sets forth that he received the keys to the defendant's home on December 23, 1954; that without using them for any purpose, he turned them over shortly to his brother Richard N. Sheppard.

Affidavit N. D. E. 4, made by Richard N. Sheppard, brother of defendant. It sets forth that he is administrator of the estate of the deceased Marilyn Sheppard; that he received the keys from Stephen A. Sheppard on December 23, 1954, and that on January 23, 1955, he made the premises (scene of the murder) available to Dr. Paul Kirk, and that Dr. Kirk examined the premises on January 23rd and 24th. Affiant says that there was no change of any kind made in the interior of the dwelling from the time he received the keys until after completion of investigation and examinations within the dwelling by Dr. Kirk.

Affidavit N. D. E. 5, made by Dr. Virgil E. Haws, an osteopathic physician and pathologist. He states he visited the home (scene of the murder) on February 12, 1955, accompanied by Dr. Richard Sheppard, Dr. Stephen Sheppard and Reverend Robert G. Scully, Pastor of the Rocky River Methodist Church. He states that the purpose of the visit was to remove two (2) blood spots from the wardrobe or closet door on the east wall of the bedroom which was the scene of the murder. He described in careful detail how that purpose was accomplished and states that the spots were placed in separate bottles and sealed in a mailing tube and handed to Reverend Scully, marked spot "A" and spot "B."

Affidavit N. D. E. 6, made by Reverend Robert G. Scully. He corroborates the recital of Dr. Haws as to the removal of the blood spots; states the mailing tubes were then and there sealed and handed to him; and that he mailed them to Dr. Paul Kirk, Berkeley, California, on February 14, 1955.

Affidavit N. D. E. 7, made by Dr. Paul Leland Kirk, an authority on criminalistics, who is at present in charge of the School of Criminology of the University of California. We shall consider its contents later.

Affidavit N. D. E. 8, made by William J. Corrigan, one of

counsel for defendant, in rebuttal to the affidavit made by Dr. Marsters for the state and received by telephone from Dr. Kirk. It is in reply to Dr. Marsters' affidavit. We shall consider its contents later.

There were filed by the state:

Affidavit N. D. E.—A, made by Saul S. Danaceau, assistant county prosecuting attorney. He states that in November 1954, there were discussions touching the subject of turning over the keys to the house to Dr. Richard A. Sheppard, father-in-law of Marilyn Sheppard, deceased, and the then executor of her estate, and that the request was denied. He also states that from the time the prosecuting attorney or his assistants entered into the case in July 1954, to the present time (April 1955): "he does not know of any instance where the defense was denied a request to inspect the said home or to make any investigation therein."

Affidavit N. D. E.—B, made by Dr. Samuel R. Gerber, Coroner of Cuyahoga County. He states that in October 1954, Fred Garmone, of counsel for the defendant, visited his office and there, in the presence of Thomas Parrino, an assistant prosecuting attorney, inspected a large number of articles which were held for evidence and which came from the house in which the deceased was murdered. The articles are listed in detail under captions: Bedding from bed of victim; Clothing of victim, Marilyn Sheppard; Clothing of Dr. Sam Sheppard, in "Hallmark" box. He also states that counsel was shown a model of the head of the victim and made notes of his view of said articles and model.

Affidavit N. D. E.—C, made by Leona Phalsgraff and Raymond Keefe, secretary and property custodian, respectively, of the coroner's office. They assert that Dr. Anthony J. Kazlauckas, a former deputy coroner of the county, visited the coroner's office in October 1954, and, on behalf of the defendant, was permitted to examine all the items which were examined by Mr. Garmone, as set forth in the coroner's affidavit, and that Dr. Kazlauckas further examined:

Autopsy protocol, Case 76629 (M. 7280) Marilyn Sheppard Conclusions for Laboratory findings.

X-rays of Marilyn Sheppard, Case 76629 taken at coroner's office.

Affidavit N. D. E.—D, made by Dr. Roger W. Marsters in charge of the Maternity Rh Laboratory at the University Hospitals in Cleveland (a clinical laboratory). We shall consider its contents later.

The bill of exceptions of the trial of the principal cause, totaling 7102 pages, a supplemental bill containing 206 pages and a great number of exhibits in case No. 23400 were also filed in this appeal. The facts therein are set forth in the opinion rendered in that case. These two appeals have been considered and decided simultaneously.

The proceedings in the trial court were had under authority of Section 2945.79, Revised Code, which reads in part:

"A new trial, after a verdict of conviction, may be granted on the application of the defendant for any of the following causes affecting materially his substantial rights:

"* * * *

"(F) When new evidence is discovered material to the defendant, which he could not with reasonable diligence have discovered and produced at the trial. * * *""

The allowance of a new trial, as set forth in the statute above, is bottomed on the proposition that the new evidence uncovered could not have been discovered and produced at the trial by the exercise of reasonable diligence. This is a basic and necessary requirement under the law. If it were otherwise, a defendant might well take a languorous attitude toward the trial of his case, be indolent in the marshalling of defensive evidence and decide to take his chances on the state being unable to prove him guilty beyond a reasonable doubt, and even be so bold as to hold testimony in his behalf in reserve to be used as grounds for another trial in case he be found guilty.

"A person indicted for a crime and on trial can not be allowed to speculate upon the outcome of his trial and to hold back evidence which he may easily procure, with the hope and expectation that, should the proof against him be more convincing than he anticipates, he can put the state to the additional expense of another trial, at which the evidence that he has suppressed can be introduced. The law favors a full discovery of all relevant evidence which has a bearing upon the criminality of the defendant. It will not permit the accused to mask his

batteries, and, having thus drawn all the fire of the prosecution, he can not, after having been convicted, take the chances of a new trial in which everything would be in his favor." Underhill's Criminal Evidence (4th Ed.), 1507, 1508, Section 836.

The Supreme Court in *Domanski* v. *Woda*, 132 Ohio St., 208, 6 N. E. (2d), 601, states the law in paragraphs three and four of the syllabus as follows:

"3. Newly discovered evidence is other than that which might have been known before the termination of a trial had due diligence been used.

"4. Where during the trial of a case a party is given reasonable cause to believe that favorable and available evidence of a material nature exists, it is his duty, in the exercise of due diligence, to ask for a continuance, if necessary, to investigate, and to produce such evidence, if found. Having finally submitted the case without doing so, and having searched for and found the evidence after verdict, he may not then successfully claim the right to a new trial on the basis that such evidence is newly discovered."

See, *Kroger, Admr.*, v. *Ryan,* 83 Ohio St., 299, 94 N. E., 428; *State* v. *Brown,* 35 Ohio Law Abs., 77, 39 N. E. (2d), 155.

The newly discovered evidence claimed by the defendant in this case was presented to the trial court in the affidavit of Dr. Paul Leland Kirk. The defendant, in effect, says that his claimed newly discovered evidence was gathered from the bedroom in which the murder was committed and from exhibits which had been admitted in evidence during the trial and, thereafter, put in the custody of the prosecuting attorney, where they were examined by Dr. Kirk on his visit here in January, 1955, together with experiments conducted by him in his laboratories at the University of California subsequent thereto.

Defendant, appellant herein, argues that he was prevented from making this investigation and performing these experiments in time for the trial because the state, through the Prosecuting Attorney of Cuyahoga County and the Chief of Police of Bay Village, retained possession and control of the premises until December 23, 1954, two days after the rendition of the verdict by the jury, when the keys to the home were turned over to the administrator of his murdered wife's estate, and that that

was the first time after the murder that he was afforded access to the place.

The facts with respect to this phase of the case are clear. Marilyn Sheppard was murdered in the bedroom of her home in the early hours of July 4, 1954. The Chief of Police of Bay Village, John F. Eaton, took immediate possession and control of the house and held the keys to it until late in August when he turned them over to a representative of the county coroner. The coroner in turn gave them to the county prosecuting attorney. The defendant and members of his family were excluded from his home. On a few occasions, however, they were allowed to enter, with a police officer in attendance, to remove some articles of clothing and other personal possessions. The public authorities completed their examination of the house on August 12, 1954. On August 23, the defendant made a written request of the chief of police for return of the keys to his house. This request was refused. Various further attempts to obtain possession and control of the house were later made by counsel for the defendant and the executor of the estate of Marilyn Sheppard—all to no avail. Around November 3, 1954, the keys were returned to Chief Eaton by the prosecuting attorney. During the trial the defendant subpoenaed the keys into court through Chief Eaton and demanded the right to retain them. The trial judge, however, ruled that they must remain in the possession of the police of Bay Village, which order was carried out until December 23, 1954, when complete possession of the house was given the defendant. There is no evidence that any request to enter the house for the purpose of investigation and inspection was ever made by the defendant, nor does the record show any formal application to the court at any time for a like purpose. Dr. A. J. Kazlauckas, a physician and expert who had spent many years as a deputy coroner of Cuyahoga County, was in the employ of the defendant. He examined all the articles of property pertaining to this case in the possession of the county coroner, together with the autopsy report, conclusions of laboratory findings and X-rays of Marilyn Sheppard, and yet made no effort to make any scientific examination of the premises. He was not even presented as a witness during the trial. Assistant Prosecuting Attorney Saul S.

Danaceau deposes in his affidavit that he informed Arthur E. Petersilge, of counsel for the defendant, and the brother of the defendant, Dr. Stephen Sheppard, in early November, "that the said house was available to the defendant at any and all times to inspect or conduct investigations therein." It seems, however, that it was understood that on all occasions a police officer would have to accompany the defendant or any representative of his when visiting the home.

Chief of Police John F. Eaton testified as follows in respect to this matter on pages 6076, 6077 and 6078 of the bill of exceptions:

Cross-examination of John Eaton.

By Mr. Mahon:

"Q. Chief, since you have had that key—you got it sometime in November, the key to the house, is that right? A. Yes, sir.

"Q. From that time down to date has the house been accessible to the Sheppard family? A. Yes, it has.

"Q. And have they been in the house during that period of time? A. Once, on one occasion, at least.

"Q. To take care of the heat, and so forth, and water, and all of those things? A. Yes.

"Q. Is that right? A. Yes.

"Q. Have they ever been denied at any time the right to go into that house since you had possession of the keys? A. They have not."

Re-direct examination of John Eaton.

By Mr. Corrigan:

"Q. Each time any member of the Sheppard family went in the house they had to get your permission? A. That's right.

"Q. And each time they went in, they were accompanied by a police officer? A. Yes, sir."

Re-direct examination of John Eaton.

By Mr. Corrigan:

"Q. And the order that Sam Sheppard could not go into his home, where did that come from? A. * * * There was no order he could not go in his home.

"Q. The order that Sam Sheppard could not go into his home except in the custody of a policeman or with a policeman,

how did that originate? A. That was suggested, I believe, by the prosecutor's office."

The burden of proof to show that this requirement of the law has been complied with is on the party moving for a new trial on the ground of newly discovered evidence.

The Supreme Court of Alabama states it thus in *Slaughter* v. *State*, 237 Ala., 26, 185 So., 373:

"An accused who moves for new trial on ground of newly discovered evidence has burden of showing due diligence."

The affidavit of Dr. Paul Leland Kirk comprises 33 typewritten pages and incorporates by reference 16 supplemental pages, classified as appendixes A to J, and 46 photographs taken and developed by Dr. Kirk.

In its total aspect, it is a most extraordinary and unusual document when related to the purposes to be served by it. The sole purpose of an affidavit offered to support a motion for a new trial on the ground of newly discovered evidence is to inform the trial court of the substance of the evidence claimed to be newly discovered which will be presented at a new trial if one is granted. It is never intended as a method to reconsider the evidence introduced at the trial of the case for the purpose of impugning the soundness of the verdict brought by the jury. If the courts permitted such practices, the inherent certainty of a trial by jury would soon wane, and such function in our system of jurisprudence ultimately disintegrate and disappear. Yet a major part of Dr. Kirk's affidavit deals with evidence presented at the trial and ventures his opinion and conclusion with respect to it, together with a criticism of the methods of investigation and technical evidence presented by the prosecution. This, of course, was entirely beyond the scope of this instrument and the trial court had the indisputable right to totally disregard every particle of it, which it did. The affiant states in his affidavit that "no instructions or suggestions were made to him as to what to find or what not to find by the attorney representing the defendant." We believe that Dr. Kirk could have spared himself much effort and time had he been told by the attorney for the defendant the narrow scope allowed him under the law for further investigation. Certainly much that is extraneous and redundant might thereby have been left out of this affidavit.

The appendixes describe various experiments carried on by Dr. Kirk to supplement and fortify his theories in connection with many elements of this case. All of them except one deal with "blood."

"A" is labeled "Blood on Watch Band." In this experiment he daubed an expansible metal watchband liberally with freshly shed blood in two separate experiments—in one, after twenty minutes, the band was dipped in fresh water and moved slowly back and forth, and in the second, the blood was allowed to dry for one and one quarter hours and treated similarly. The time required to dissolve the blood was noted.

"B" is labeled "Time of Drying of Blood." In this experiment the same watchband illustrated in "A" was daubed liberally with fresh blood from a punctured finger. The time of drying on smooth surfaces and in the recesses of the individual bars was noted. Blood also was smeared over the back of the band, and the time for drying noted.

"C" is labeled "Blood Trails" and gives his opinion as to the significance of the blood spots found throughout the house, particularly with reference to the steps.

"D" is labeled "Shedding of Blood from Clothing." Experiments were made with five series of cloths, cotton, wools, rayon and silk. These were suspended and liquid human blood thrown against them by means of a brush dipped in blood and the time taken when the blood was applied and measured until the last drop fell spontaneously from the garments.

"E" is labeled "Spots from Weapon." Two series of experiments were performed with a variety of objects which would illustrate effects similar to some common weapons. They were:

1. A large bread knife, with a roughly triangular blade 8" in length and a breadth at the widest point of 1½".

2. A large monkey wrench, 15" in length, with a jaw 1¾" deep and a maximum opening of 4".

3. A brass bar, 11¾" in length, ¾" wide and ⅛" thick.

4. A bar of soft wood, 23" long, 1" wide and 7/16" thick.

5. A small ball pein hammer, with a head length of 2½" and a face ¾" in diameter.

The first experiments involved dipping these objects in liquid blood, removing them and holding them over paper and

recording the time necessary for all blood to drain or drop from the object. This was supplemented by a similar timing while the object was swinging at a moderate rate in the hand.

Then a similar set of experiments was made with objects 1, 2 and 3 above, in which the dripping weapon was carried over long strips of paper at ordinary quick walking speeds, and the distance measured to the last drop that fell.

"F" is labeled "Transport of Blood by Shoes." This experiment was performed by stepping repeatedly in a region of heavy blood spots on a floor until the shoe soles were thoroughly blood-smeared and then having a person walk normally along a strip of wrapping paper until no more blood was visually apparent on the paper. The last visible trace of blood was then measured.

"G" is labeled "Blood Removal from Shoes." The experiment consisted of daubing a shoe with leather sole and stitching with about two dozen spots of freshly shed human blood. Most of it was placed along the stitching but various spots were placed at random on the leather of the sole. The shoe stood for thirty-five minutes to allow complete soaking of the blood into the leather and complete drying. It was then immersed in water and forced back and forth in the water, to simulate the wasting action of water movement, for five minutes. The condition of the shoe as to blood spots was then noted and any spots still remaining were rubbed vigorously with paper toweling until no actual spots could be seen, this to simulate the action caused by walking. The shoe thereafter was immersed in fresh water for five minutes and removed and allowed to dry. The tenacity with which blood adheres to such surfaces was thus shown.

"H" is labeled "Amount of Blood Spatter on Clothing." This appendix discloses the spatter of blood on the set of coveralls worn during the entire series of experiments. It also was determinative of any dripping of blood from the garment.

"I" is labeled "Nature of Blood Spots from Different Origins." In this experiment a wooden block was taken as approximating the hardness of a skull. A layer of sponge rubber $\frac{1}{8}$" thick was placed over it, this being about the thickness of the subcutaneous layer of the forehead and scalp. Then a sheet

of polyethylene plastic, to simulate the skin, was placed over the sponge rubber. The arrangement so prepared was placed on a stool on wrapping paper to collect blood spatter. Around the region was built a rectangular wall carrying removable paper strips to collect all flying blood on the sides and in front of the swings of the object used as a weapon. Paper strips to collect blood flying upwards were placed over the top. Only on the operator's side was the structure open, the operator collecting the blood that traveled backward. The objects used as weapons included a small ball pein hammer; a metal two-cell flashlight with a flared rim; an inch steel bar, 15 inches long; a brass rod 20 inches long, bent at right angles on the end; and a brass bar, $\frac{3}{8}$ inches in diameter and 2 feet long. Blood was puddled on the top of the plastic cover, and heavy blows were dealt that at least with one object, the plastic sheet and rubber sponge were cut through to the wood. The paper strips were removed from the walls after each series of blows of a certain type and object and photographed. The characteristics of the spattered blood from impact as well as the throw-off blood on the fore and back strokes were noted from the standpoint of direction and velocity and the size of the drop.

"J" is labeled "Breaking of Teeth." Experiments were carried on with seven incisor teeth chosen from some 15 to 20 incisor teeth obtained from dentists who had extracted them. To anchor the roots of the teeth solidly as in a jaw, holes were drilled in a heavy brass bar. A hole was filled with molten "Woods" metal, an antimony alloy that melts below the boiling point of water, the root was held in the liquid metal until the alloy was solid and all teeth so mounted could not be moved until the metal was remelted. The method of breaking the teeth varied but usually consisted of pulling steadily on them by means of a hooked notch cut in a brass bar. Tests were also made attempting to break an unmounted tooth with the bare hands. The manner of fracture was then studied and compared to the teeth fragments found in Marilyn Sheppard's bed.

These experiments were devised by Dr. Kirk after an inspection of the Sheppard premises and a view of all the exhibits in the hands of the prosecuting attorney. There is no reason that we can see that would have prevented him from

carrying out the same program before or during the trial of this case in the exercise of due diligence.

The affidavits and the evidence at the trial disclose a disposition on the part of both the Chief of Police of Bay Village and the Prosecuting Attorney of Cuyahoga County to comply with any reasonable request for such inspection of the premises. Moreover, it is inconceivable that a formal application to the Presiding Judge in the Criminal Branch of the Common Pleas Court for the exercise of such right would not have been granted. These experiments consequently can not be considered newly discovered evidence. They could have been prepared for presentation at the trial had due diligence and reasonable foresight been exercised by the defendant, and no grounds for the allowance of a new trial exist on this claim.

In *Salinardi* v. *State,* 124 Conn., 670, 2 A. (2d), 212, the Supreme Court of Connecticut had the following to say, at page 672:

" '* * * * to entitle a party to a new trial for newly-discovered evidence, it is indispensable that he should have been diligent in his efforts fully to prepare his cause for trial, and if the new evidence relied upon could have been known with reasonable diligence, a new trial will not be granted.' "

Aside from the question of due diligence, these experiments, in our opinion could not have been admitted in evidence in the trial of this murder case. Experiments, to be admissible as evidence, must be performed with identical or substantially similar equipment and under conditions closely approximating those existing at the time of the occurrence being investigated. None of the material used for these experiments was the same as that existing at the time of the murder. The most important, the head of the victim, was attempted to be simulated by a contraption conjured up by Dr. Kirk without any scientific correlation to the original body whatever. The weapons used were selected on the basis of pure speculation. The teeth were not related to those of the deceased for strength or hardness. Furthermore, the coagulation of blood differs with different persons and is affected by the factors—the temperature and the humidity. The temperature and humidity in the bedroom at the time of the murder are unknown and the coagulation time

of Marilyn's blood as well as the blood used in the experiments are unknown. How would it be possible under these unknown factors as to both material and conditions to conduct experiments acceptable in a court of law? It must be said that they are interesting and no doubt would be of value in a textbook on the subject, but clearly they would have no probative value in the trial of this cause.

The rule is stated in 17 Ohio Jurisprudence, 587, Section 479, as follows:

"The general rule is that to render experiments or evidence of experiments made out of court, admissible, the conditions need not be identical with those existing at the time of the occurrence in question; it is sufficient if there is substantial similarity. The Ohio courts accord with this general rule. But obviously the probative value of experiments will depend upon the correspondence of the conditions under which they are performed to those of the occurrence being investigated. If there be an exact correspondence of such conditions the experiment will amount to a demonstration and be conclusive upon the issue; dissimilarity of conditions and experiments may affect not merely the weight of the evidence, but its admissibility. * * * If it is utterly impossible to perform an experiment upon facts and under circumstances substantially similar to those in issue, evidence offered of an experiment is inadmissible."

Paragraph seven of the syllabus of *Bickley* v. *Sears, Roebuck & Co.*, 62 Ohio App., 180, 23 N. E. (2d), 505 (motion to certify overruled by the Supreme Court), states:

"7. Evidence as to the result of experiments made by a party after an accident, to be admissible, must show the facts surrounding the experiments were substantially the same as they were at the time of the accident."

Paragraph one of the headnotes to *State* v. *Farrell*, 64 Ohio Law Abs., 481, 112 N. E. (2d), 408 (Court of Appeals, Eighth District, motion to certify overruled), reads:

"1. It is not necessary, in order to render experiments or evidence of experiments made out of court admissible, that the conditions be identical with the conditions existing at the time of the occurrence in question; it is sufficient if there be substantial similarity; however, the probative value of such experi-

ments depends upon the correspondence of the conditions under which they are performed to those of the occurrence under investigation.''

Dr. Kirk, in his affidavit, under the title, ''Technical Evidence of the Prosecutor,'' discusses *Water under defendant's wristwatch crystal; loss of T-shirt; the claimed drying of blood on Mrs. Sheppard's wrist before her watch was removed; and drying of blood on defendant's watch before it was inserted in the green bag.*

Under the title, ''Blood trails,'' he discusses *clothing; weapon; skin of hands* (or face, etc.); and *shoes* and then discusses *green bag and contents;* and *blood on defendant's clothing.* His opinion as to each of the indicated subjects is based upon experiments described in Appendixes A, B, C, D, E, F, G and H. They amount to mere criticism of the manner in which the prosecution's evidence was gathered, doubt as to its evidence having any bearing at all on the guilt or innocence of the defendant, and his personal opinion as to its significance. In no sense can this be interpreted as newly discovered evidence.

The next division in the affidavit is entitled, ''The Murder Scene,'' and the main discussion comes under the heading *blood distribution.* He there describes the distribution of blood on the walls, defendant's bed and the radiator. By determining the point of origin, he gives the opinion that the head of the victim was essentially in the same position during all of the blows from which blood was spattered on the defendant's bed; that her head was on the sheet during most, if not all, of the beating that led to the blood spots; that probably all of the blood drops on the east wall were thrown there by the back swing of the weapon used; and that the blows on the victim's head came from swings of the weapon ''which started low in a left hand swing, rising through an arc, and striking the victim a sidewise angular blow rather than one brought downward vertically.'' He then explains the *cause of distribution* and comes to the conclusion based on his experiments as described in Appendix I and his observation of the blood distribution in the bedroom that the blows were struck by a left-handed person. He then proceeds to explain the impact spatter, and the throw-off drops of certain weapons, and decides that the blood spots on the

doors of the bedroom were drops made by the back-throw of the lethal weapon, and that a very large spot on the wardrobe door could not have come from the back-throw of the weapon. This spot measured about one inch in diameter. He then expostulates that "this spot could not have come from impact spatter. It is highly improbable that it could have been thrown off a weapon," and that "it almost certainly came from a bleeding hand.—The bleeding hand could only have belonged to the attacker."

We read this portion of Dr. Kirk's affidavit with much interest for it displayed high qualities of originality and imagination, blended with a wide range of knowledge of the subject discussed. However, none of it is newly discovered evidence as contemplated by the law and has no juridical value in this case because:

(1) It includes matter that could have been offered at the trial had due diligence been exercised.

(2) Most of the facts involved had been given to the jury at the trial.

(3) The conclusion that the assailant was a left-handed person was argued to the jury at the trial, and, besides, was not a subject for opinion evidence since it was a conclusion for the jury alone to draw in the exercise of its common sense and ordinary knowledge from the facts and circumstances as shown by the evidence.

(4) The opinion that the large spot could not have come from the murder weapon was guesswork, since the weapon itself is unknown.

(5) The statement that the large blood spot came from the bleeding hand of the assailant is sheer supposition.

(6) The impossibility of performing experiments to approximate the facts and circumstances of the occurrence involved.

17 Ohio Jurisprudence, 588, Section 479, reads:

"If it is utterly impossible to perform an experiment upon facts and under circumstances substantially similar to those in issue, evidence offered of an experiment is inadmissible."

In paragraph four of the syllabus of *Ohio Power Co.* v. *Fittro, Admx.,* 36 Ohio App., 186, 173 N. E., 33, it is stated:

"4. In action for death by electrocution, demonstrative evidence to show distance voltage would jump from wire *held* properly excluded, in view of impossibility of performing experiment on facts in issue."

Also, 17 Ohio Jurisprudence, 415, Section 324, reads:

"Jurors are supposed to be competent in everything pertaining to the ordinary and common knowledge of mankind, and to be peculiarly qualified to determine the connection between cause and effect established by common experience, and to draw the proper conclusions from the facts before them."

The syllabus of *Perkins* v. *State,* 5 C. C., 597, 3 C. D., 292, states:.

"Upon the trial of a case, where the accused is charged with murder in the second degree, physicians having been called on behalf of the state, who testified that they attended the *post mortem* examination, giving a full description of the wounds found upon the head of the deceased, their location, and that they were sufficient to produce death, it is error to permit such witnesses to give testimony against the objection of the accused as to the probable relative position of the parties at the time the fatal blow was struck; such testimony is the mere opinion of the witnesses based upon the facts proven, and from which the jury is as capable of drawing proper inference as the witnesses."

The wounds on Marilyn Sheppard's face and head show a vicious attack with great force directed to vital spots. Because of their character, number and location, the jury may well have concluded that the wielder of the weapon, being impelled by consuming rages and sudden animosity, had a definite purpose to kill, and further that a person so motivated would strike from any direction necessary to accomplish his purpose.

In view of these circumstances, the deductions of Dr. Kirk that the pattern of blood spatter, the position and direction of the victim's head and the assumed position of the assailant are only consistent with the hypothesis that the murderer was a left-handed person is, in our opinion, highly speculative and fallacious.

The next division of Dr. Kirk's affidavit is titled, "Blood Groups and Individuality." He states that the grouping of the

large spot of blood found on the wardrobe door was performed simultaneously with the same sera and cells and in identical manner as the known blood of Marilyn Sheppard removed from the mattress and the second large spot (½″ in diameter) removed from the wardrobe. The latter was used for a control test and dissolved readily in distilled water and gave no sign of delayed agglutination, as was true of the known blood of the victim, but the large spot "was definitely less soluble than that from the smaller spot, or from controls from the mattress"; and "in running the agglutination tests, in every instance and with tests for both A and B factors, agglutination was much slower and less certain than the controls. The fact that delayed agglutination occurred indicated clearly that this blood was also O group, but its behavior was so different as to be striking. These differences are considered to constitute confirmatory evidence that the blood of the large spot had a different individual origin from most of the blood in the bedroom."

The balance of Dr. Kirk's affidavit deals with *tooth fragments; blood-stained bedding; the weapon and miscellaneous items* (1) *victim's slacks,* (2) *top sheet of victim's bed,* (3) *pillows,* (4) *nail polish fragments,* and (5) *leather fragment.* All these matters were covered in detail in the trial of the case and under no circumstances can be called newly-discovered evidence. Nevertheless, he undertakes to state his own ideas concerning them and advances his personal theories as to their significance in the case. We know of no rule of law permitting a re-evaluation of a decided case by a person versed in criminalistics, with the purpose in mind of laying the groundwork for a new trial.

The final subject of the affidavit is styled, "Reconstruction" with the subtitle, "Defendant's Account." In this discussion, the affiant gives his own version of the murder from the standpoint of his interpretation of the physical facts, and then adroitly fits in the defendant's story to conform to the same. It is inconceivable that such testimony could be given to a jury at a retrial of this cause. It would be usurping the function of the jury.

The Supreme Court in *Fowler* v. *Delaplain,* 79 Ohio St., 279, 87 N. E., 260, 21 L. R. A. (N. S.), 100, paragraph one of the syllabus, says:

"A question to a witness which calls for his opinion on the precise issue of fact which the jury is sworn to determine from the evidence, is incompetent."

Also, in *Hartford Protection Ins. Co.* v. *Harmer,* 2 Ohio St., 452, 59 Am. Dec., 684, paragraph three of the syllabus reads:

"Opinions are only admissible, where the nature of the inquiry involves a question of science or art, or of professional or mechanical skill, and then only from witnesses skilled in the particular business to which the question relates."

Dr. Kirk's opinion as to the large blood spot, discussed above, requires further consideration on our part.

Dr. Roger W. Marsters, a recognized authority on blood, deals entirely with this claim of Dr. Kirk's in his affidavit. He states:

"Under ideal conditions * * * variability occurs in the routine performance of blood grouping * * *. These variables are almost always quantitative differences rather than qualitative ones. * * *

"Dr. Kirk is postulating different qualities of type O blood characteristic. Even under ideal conditions of fresh blood reactions, sub-groups of type O are unknown. Therefore, to assume the existence of another quality of type O and especially another individual source on the basis of some quantitative difference in reaction and solubility employing an admittedly complex technique cannot be justified."

Dr. Kirk in his rebuttal affidavit questions the qualifications of Dr. Marsters in absorption grouping of dried blood. He admits "differences in regular blood grouping do occur * * *," and that "much greater differences occur in grouping dried blood because of variation in the conditions under which blood is stored, admixture with foreign substances * * *," but says "these conditions * * * do not apply to the present case." He further says that variations in behavior of different types of blood are due to minor variations in technique or conditions and that these are extremely small when run by experienced persons, that samples of blood of two different persons, even though of the same group will often behave differently; and that any variation in them of a magnitude greater than small experimental variation, when treated identically, must be significant.

He claims that the two spots in this case "were deposited on the same paint, on the same panel of the same door and close together." They appeared normal, were free of contaminating substances and that there was "no indication of any accidental or uncontrolled variation between the two spots that could account for the differences claimed."

He says, "no postulate was made by me of different qualities of type O blood characteristic, nor of any hypothetical 'subgroups.' Rather the claim concerns different qualities of blood, both of which happen to be of type O," and cites Lattes "Individuality of the Blood" as authority "that wide differences do occur in group O bloods."

He further states:

"7. Solubility differences claimed do not rest on different times necessary to dissolve different size of samples. The samples used were of closely the same size, and the difference in solubility rather was so great as to be many times that which could be caused by different size of sample.

"8. It is well known that agglutination of cells in the presence of blood from a pregnant woman is more rapid than for non-pregnant persons (See Lattes 'Individuality of the Blood'). Agglutination in presence of known blood from the bed on which the victim died was even more rapid than was that of the controls, which was found also with the lower spot from the wardrobe door. Both were in very marked contrast to the very slow speed of agglutination of the identical serum-cell system containing extract of the large spot. All were determined simultaneously with the same serum, cells and equipment and all were repeated for verification with the same results."

At the very outset of the consideration of this controversy of the experts, one fact stands out crystal clear. Each of the three blood spots involved in the dispute has been typed as group O, which is Marilyn's blood grouping. Dr. Kirk, though, maintains that the slow speed of agglutination of the large spot as compared to the same reaction with respect to the known blood of Marilyn Sheppard and the smaller control spot, confirms the presence of some other person than Marilyn Sheppard and the defendant during the murder. He refers to a book by Leone Lattes titled, "Individuality of the Blood," to uphold

his position in the matter. Now this author does say on page 67 that:

"The numerous individuals who belong to one and the same group do not all of them show exactly the same behavior with regard to iso-agglutination."

But, he also says on page 70:

"Some writers (Baecchi) have suggested that these quantitative differences in agglutinins might be used for individual sero-diagnosis. But we now know that these variations are generally contingent and accidental, and do not depend upon individual constitutional factors."

And, on page 261:

"The existence of the blood group as a fixed and constitutional individual characteristic is now definitely established. * * *

"Moreover, the most recent investigations have explained in a very satisfactory manner the reason why the workers who first investigated blood-stains met with so many discrepancies and exceptions. We must first of all take into account the actual state of the blood in the stains, and endeavour to realize in what way and up to what point this is likely to affect the reactions used to demonstrate the individuality of fresh blood. * * * In these stains the blood is dry and more or less old. In some cases it has been subjected to the detrimental action of physical (heat, light) or chemical (oxidation, various chemical substances) agents. * * *

"A medico-legal diagnosis is only possible provided these detrimental influences have not altered the substances concerned in the iso-reactions to such an extent as to inhibit these reactions. * * *

"We know (pace Verdier) that desiccation by itself does no harm. * * *

"As to other factors, this is clearly a question of degree."

On page 268 he states:

"Drying, which does not in itself affect iso-agglutination, has this disadvantage that the blood has to be redissolved: this is a very delicate process and may readily lead to serious errors."

On page 271 he states:

"These quantitative differences cannot easily be ultilized in forensic cases relating to blood-stains, for the blood in these has invariably undergone changes due to age or other deleterious circumstances, which attenuate the agglutinins."

On page 272 he states:

"These sub-groups would appear to be fairly constant, though, since we have to deal with quantitative differences (Thomsen), the possibility of differentiating between them for forensic purposes would seem to be likely to remain somewhat uncertain.

"The differentiation between individuals belonging to Group O, which Landsteiner and Levine claim to have accomplished by means of human iso-agglutinating sera is still more problematical."

On page 292 he states:

"Further, in investigations where we have to start from dried blood, particularly in forensic cases, the methods suggested by a number of writers, as we saw on page 268, do not prevent the occurrence of mistakes, and might even be said to favour them."

Dr. Kirk seems to believe that the fact that the large spot dissolved more slowly and that the agglutination tests appeared more slowly is "confirmatory evidence" that this spot originated from a different individual. Such difference in reaction is quantitative only. It, under no circumstances, denotes a qualitative difference. The weight of the expert opinion seems to be that such differences may be attributable to factors of contamination. It must be remembered that this large blood spot was on the wardrobe door some eight months during changes of temperature, humidity, and in a room that had had many persons milling about, doing various chores, and conducting many tests. Moreover, it was scraped from a door covered with coats of paint. How much of this paint was removed at the time of scraping no one knows. The test is a delicate one involving small quantities of material. A large drop of blood, too, would take longer to dry. What bacterial or chemical contamination befell it is not known. Fingerprint dusting powder, ultra-violet light, dust, detergent deposit, perspiration or body oils of human origin were present in the room. Dr. Kirk him-

self in his book on "Crime Investigation" says on pages 198 and 199:

"O blood which contains neither A or B agglutinogen contains both agglutinins * * *."

And, on pages 199 and 200, he says:

"It is also clear that variations of considerable magnitude in the strength of reaction exists between persons classed in the same group. For this reason, there are various subclassifications such as $A_1$ and $A_2$ in use among serologists. The distinction between these rests chiefly on the strength of reaction and can be obtained satisfactorily only when fresh blood is available. With dried blood stains, the form in which most blood appears in evidence, it is not simple to determine the subgroups with certainty."

And on page 201:

"It should be noted further that, on standing, the agglutinins are slowly lost in many bloods. For this reason, a test which depends only on testing for agglutinin is to be trusted completely only when the blood is comparatively fresh, or when the results are checked also by methods testing for the presence of agglutinogen as well."

From a careful consideration of the affidavits on this subject, as well as the authorities referred to above, we find:

(1) That Dr. Kirk's contention rests on the difference in time in the appearance of agglutination of the large spot when compared to the same reaction of known blood of Marilyn and the smaller spot used as a control;

(2) that Dr. Kirk believes that this difference confirms the presence of a person at the murder scene other than the victim and the defendant;

(3) that experts contra say that such differences are not unusual even with known samples of the same blood and at most is a quantitative and not a qualitative difference;

(4) that all three blood samples were of the same blood group, known as O;

(5) that the samples tested, being dried blood exposed for some eight months in a room subjected to many activities by many persons, who examined and tested various parts of the room, were exposed to contamination of many sorts: bacteria,

fingerprint dusting powder, hand or body oils and perspiration, dust and other substances;

(6) that in the removal of the stain from the wardrobe door, paint, soap and detergents may have been scraped off;

(7) that experts agree that tests conducted on dried blood are not as reliable as those made on fresh blood; and

(8) that no court, to our knowledge, has accepted such findings as proof of blood from different persons.

We conclude from all the foregoing that the opinion of Dr. Kirk, that "these differences are considered to constitute confirming evidence that the blood of the large spot had a different individual origin from most of the blood in the bedroom," even though such blood had the same blood grouping as that of Marilyn Sheppard's, is based on claims so theoretical and speculative in view of Dr. Marsters' affidavit, the statements of authority referred to by Dr. Kirk and his own writings on the subject as to have no probative value in support of defendant's claim of newly discovered evidence.

A motion for a new trial on the ground of newly discovered evidence is directed to the sound discretion of the trial court.

The Supreme Court in *Taylor* v. *Ross,* 150 Ohio St., 448, 83 N. E. (2d), 222, 10 A. L. R. (2d), 377, in paragraph two of the syllabus, states:

"2. The granting or refusing of a new trial on the ground of newly discovered evidence rests largely within the sound discretion of the trial court; and when such discretion has not been abused, reviewing courts should not interfere. (Paragraph two of the syllabus in the case of *Domanski* v. *Woda,* 132 Ohio St., 208, approved and followed.)"

See: *Smith* v. *Bailey,* 26 Ohio St., 1; *State* v. *Lopa,* 96 Ohio St., 410, 117 N. E., 319; *Canton Stamping & Enameling Co.* v. *Eles,* 124 Ohio St., 29, 32, 176 N. E., 673; *Domanski* v. *Woda, supra; State* v. *Petro,* 148 Ohio St., 505, 76 N. E. (2d), 370; *State* v. *Tarrant,* 83 Ohio App., 199, 80 N. E. (2d), 509; *Pannell* v. *State,* 13 Ohio Law Abs., 244; *Cebulek* v. *Tisone,* 28 Ohio Law Abs., 166.

The trial court did not abuse its discretion in this regard.

Paragraph three of the syllabus of *People* v. *Fice,* 97 Cal., 459, 32 P., 531, reads as follows:

"It is not an abuse of discretion for the trial court to deny a motion for a new trial in a criminal prosecution, made upon the ground of newly discovered evidence, where the affidavits offered in support thereof are fully contradicted by counter-affidavits on the part of the prosecution."

It is the law with respect to a motion of this kind that a new trial will not be granted on the ground of newly discovered evidence unless the affidavits in support thereof contain statements which, if it had been offered in evidence at the trial, would have required the jury to return a different verdict.

The Supreme Court in *Cleveland, Columbus, Cincinnati & Indianapolis Rd. Co.* v. *Long,* 24 Ohio St., 133, says:

"A new trial should not be granted on the ground of newly discovered evidence, unless the legitimate effect of such evidence, when considered in connection with that produced on the trial, ought to have resulted in a different verdict or finding. The rule of practice, on this subject, was not substantially changed by Section 297 of the Code of Civil Procedure."

See: *Cleveland Ry. Co.* v. *Leanza,* 7 Ohio Law Abs., 583; *Licate* v. *State,* 4 Ohio Law. Abs., 53; *DeSantis* v. *Brumbaugh,* 7 Ohio Law Abs., 711; *Martin* v. *State,* 12 Ohio Law Abs., 173.

The trial court in its written opinion on this question said:

"It is not reasonable to believe that production of the testimony of Dr. Kirk at the trial, and the counter-testimony of Dr. Marsters, would have made the slightest difference in the total evidence, and certainly not resulted in a different conclusion by the jury."

We believe the trial court was in the best position to determine that question.

Having read the voluminous evidence of the murder trial, studied in detail the affidavits filed in support of and contra to the motion, and the briefs of counsel, and having come to the several conclusions stated above, we unanimously hold that the trial court did not commit prejudicial error or abuse its discretion in overruling the motion for a new trial on the ground of newly discovered evidence.

*Judgment affirmed.*

Skeel and Hurd, JJ., concur.